# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JASON MILO FARR,

                Plaintiff,

v.

LIEUTENANT STAAT, OFFICER HUNTER, MILWAUKEE COUNTY, and JOHN DOES,

                Defendants.

Case No. 17-CV-1341-JPS

**ORDER**

        This case comes before the Court on Defendants' motion for summary judgment, after a somewhat tortured procedural background. For the reasons stated below, the Court is constrained to deny the motions to appoint counsel and to compel. Additionally, Defendants' motion for summary judgment will be granted and the case will be dismissed.

**1.    PROCEDURAL BACKGROUND**

        Plaintiff filed the above-captioned litigation on September 29, 2017. (Docket #1). On October 19, 2017, Magistrate Judge William E. Duffin allowed Plaintiff to proceed on Fourteenth Amendment claims against Lieutenant Staat, Officer Hunter, and several other Doe defendants for physical and verbal abuse sustained during his booking at Milwaukee County Jail ("MCJ"). (Docket #5 at 5). Magistrate Duffin also allowed Plaintiff to proceed on a *Monell* claim against Milwaukee County for a custom of beating inmates on elevator rides and engaging in a code of silence thereafter. *Id.* at 7. The case was reassigned to Judge Lynn Adelman on January 2, 2018.

That same day, Plaintiff filed a motion to compel, (Docket #15), in which he requested video images that he claimed consisted of him being beaten, moved around the jail in a wheelchair, and subsequently stitched up by a nurse. *Id.* at 1. Plaintiff also requested the names and photos of the officers who worked on the day of the incident, as well as the nurses who were on staff at the time. *Id.* Defendants timely opposed the motion on the grounds that they had never received any initial discovery requests, so the motion to compel was premature. (Docket #19 at 1). Defendants also explained that Plaintiff had failed to comply with Civil Local Rule 37, which requires written certification of a good faith attempt to confer with the opposing party about discovery disputes. *Id.* at 2. On March 2, 2018, during a scheduling conference at which Plaintiff failed to appear, Judge Adelman denied the motion to compel as premature. (Docket #27).

At a second, more successful scheduling conference on March 19, 2018, Judge Adelman advised Plaintiff to find counsel to represent him in the matter. (Docket #28). Two days later, Judge Adelman issued a trial scheduling order, which set a deadline to join additional parties and amend the pleadings for May 1, 2018. (Docket #29). Dispositive motions were due on December 30, 2018. *Id.*

The case progressed without further involvement of the Court. Plaintiff did not move to join additional parties or amend his pleadings, nor did he file his expert disclosures. The docket was completely silent until November 29, 2018 when, pursuant to the scheduling order, Defendants filed their expert witness list. (Docket #30). A week later, Plaintiff filed a motion to appoint counsel, in which he explained that he had had difficulty securing counsel because no law firm was "willing to go up against the city." (Docket #32 at 1). He explained that he had contacted all the lawyers

on a list provided by Judge Adelman, conducted his own research, and struck out. *Id.* However, he did not provide any proof that he reached out to these law firms, nor did he assert that the case was complex, nor did he explain why he was incapable of carrying on the litigation himself. *See id.*

A week after that, with the summary judgment deadline looming at the end of the month, Plaintiff filed a motion for reconsideration of the original motion to compel production of the video footage. (Docket #34). In this motion, he asked Judge Adelman to step down because he was prejudiced and minimized Plaintiff's injuries. *Id.* at 1. He also moved to add Officer Rashed Farrakhan as a defendant, whose identity Plaintiff discovered on the news, and who, Plaintiff claims, was in the room during his beating, even though Defendants did not include him on their witness list. (Docket #34 at 1–3). On December 20, 2018, Plaintiff filed a motion, which remains pending, to extend the discovery deadline. (Docket #35).

On December 31, 2018, Defendants filed a motion for summary judgment. (Docket #36). Ten days later, Defendants' counsel filed a letter with the Court requesting an extension of Plaintiff's deadline to respond to the motion for summary judgment. (Docket #45). Defendants explained that there was a chance that Plaintiff may not have received the motion for summary judgment due to an issue with his mailing address. *Id.* The Court granted this motion for an extension, and Plaintiff was ordered to oppose summary judgment by February 11, 2019. (Docket #50). Plaintiff's motion to extend the discovery deadline was left unresolved. *See* (Docket #35).[1] Plaintiff never opposed the motion for summary judgment, and on

---

[1] In light of the order to extend the summary judgment deadline (Docket #50), Plaintiff's motion to extend the discovery deadline will be denied as moot.

February 25, 2019, Defendants filed a letter indicating that they would not be filing a reply in light of the lack of response. (Docket #51).

The following month, on March 13, 2019, Defendants filed a letter to the Court stating that Plaintiff had a new address about which he had failed to update the Court. (Docket #53 at 1). Defendants also drew the Court's attention to an email in which Plaintiff made accusations of unethical conduct against both Defendants and Judge Adelman. *Id.* Finally, Defendants provided evidence that they had sent the much-sought-after video surveillance evidence to Plaintiff, despite Plaintiff's claims that he never received it. (Docket #54-2).

In response to the allegations of unethical conduct against the Court, Judge Adelman recused himself and the matter was randomly re-assigned to this branch of the Court. On March 22, 2019, after the case was re-assigned, Plaintiff filed a profanity-laced letter addressed to Judge Adelman, expressing his frustration with the litigation and the fact that the Doe defendants had not yet been named. (Docket #57 at 1–3). That same day, he filed a letter addressed to Judge Stadtmueller, in which he described his frustration with the litigation in more diplomatic terms. (Docket #58). In this motion, he requested to add four additional officer defendants. *Id.* at 3. Defendants opposed this request as untimely and provided some background on the discovery process, including the fact that Plaintiff failed to provide initial disclosures or respond to requests for admission, and only filed his own discovery requests ten days before the summary judgment deadline. (Docket #59 at 3–4). In light of the motion's untimeliness and Plaintiff's failure to litigate according to the terms of the scheduling order, that motion will be denied. *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994)

("pro se litigants are not entitled to a general dispensation from the rules of procedure or court imposed deadlines.").

On May 20, 2019, Plaintiff filed another motion to compel video surveillance and notice of change of address. (Docket #61). He explained that MCJ had records of the names of the inmates who could testify to the amount of blood he lost, and vented that Defendants have not been forthcoming about the identities of the other officers who were in the booking room when he was assaulted. *Id*. Again, Defendants opposed this on the grounds that Plaintiff did not timely file discovery requests and failed to comply with Civil Local Rule 37. (Docket #62). That motion will be denied for the reasons explained in Section 3, *infra*.

2.      **MOTION FOR APPOINTMENT OF COUNSEL**

   2.1   **Legal Background**

As a civil litigant, Plaintiff has "neither a constitutional nor statutory right to a court-appointed attorney." *James v. Eli*, 889 F.3d 320, 326 (7th Cir. 2018). However, under 28 U.S.C. § 1915(e)(1), the "court may request an attorney to represent any person unable to afford counsel." The court should seek counsel to represent a plaintiff if: (1) he has made reasonable attempts to secure counsel; and (2) "'the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it.'" *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013) (quoting *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007) (en banc)). Whether to appoint counsel in a particular case is left to the Court's discretion. *James*, 889 F.3d at 326; *McCaa v. Hamilton*, 893 F.3d 1027, 1031 (7th Cir. 2018).

While framed in terms of the plaintiff's capacity to litigate, this discretion must also be informed by the realities of recruiting counsel in this District. When the Court recruits a lawyer to represent a *pro se* party, the

lawyer takes the case *pro bono*. Unlike a lawyer appointed to represent a criminal defendant during his prosecution, who is paid by the government for his work, an attorney who takes a pro se civil case *pro bono* has no promise of compensation.

It is difficult to convince local lawyers to take such cases. Unlike other districts in this Circuit, *see, e.g.*, L.R. 83.35 (N.D. Ill.), the Eastern District of Wisconsin does not employ an involuntary appointment system for lawyers admitted to practice here. Instead, the District relies on the willingness of lawyers to sign up for the Pro Bono Attorney Panel and, once there, accept appointments as needed. *See* Pro Bono Program, *available at*: http://www.wied.uscourts.gov/pro-bono-fund.

The District is eternally grateful to the lawyers who participate in the Pro Bono Program, but there are never enough volunteers, and those who do volunteer rarely take more than one or two cases a year. This is understandable, as many are already busy attending to fee-paying clients. Though the Pro Bono Program does provide for payment of certain litigation expenses, it does not directly compensate a lawyer for his or her time. Participants may seek attorney's fees when permitted by statute, such as in successful Section 1983 cases, but they will otherwise go unpaid. The small pool of attorneys available to this District for *pro bono* appointments stands in stark contrast to that of the Court of Appeals, which regularly recruits counsel from across the nation to represent *pro se* plaintiffs on appeal. *See, e.g., James*, 889 F.3d at 323 (appointing counsel from Washington, D.C. to represent the *pro se* appellant); *McCaa*, 893 F.3d at 1029 (same).

**2.2 Analysis**

With these considerations in mind, the Court returns to the question presented: whether counsel can and should be appointed to represent Plaintiff. First, the Court asks whether the litigant has made "reasonable" efforts to obtain his own representation. *Pruitt*, 503 F.3d at 655; *Jackson v. Cty. of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992). It is a question not often litigated; many district judges either overlook arguably unreasonable efforts at obtaining counsel, or they impose eminently practical requirements such as the submission of evidence demonstrating that the litigant has tried and failed to secure representation from several lawyers. *See, e.g.*, *Kyle v. Feather*, No. 09–cv–90–bbc, 2009 WL 2474627, at *1 (W.D. Wis. Aug. 11, 2009).

The first element of *Pruitt* is fairly easy to satisfy, but it is not toothless, and it is not a mere technical condition of submitting a certain number of rejection letters. If it was, then a Wisconsin *pro se* plaintiff litigating a Section 1983 action could submit rejection letters from ten randomly selected criminal defense lawyers from Nevada and call his work complete. This cannot be tolerated. The purpose of the reasonable-efforts requirement is to ensure that if the Court and private lawyers must expend scarce resources to provide counsel for a *pro se* litigant, he has at least made a good-faith effort to avoid those costs by getting a lawyer himself. To fulfill this duty, a *pro se* litigant should reach out to lawyers whose areas of practice suggest that they might consider taking his case. If he learns that some of the lawyers he has contacted do not, he should reach out to others before he concludes that no one will help him.

Here, Plaintiff claims that he has exhausted a list of potential legal options, and that he conducted his own independent and equally fruitless

search for an attorney. Plaintiff has not submitted any evidence demonstrating that he failed, much less even tried, to secure representation; therefore the Court has no way of evaluating the extent and reasonableness of his efforts. Nevertheless, even if the Court assumes that Plaintiff made thorough and well-targeted efforts to obtain counsel, Plaintiff's request falters on the second *Pruitt* step: whether the difficulty of the case exceeds his capacity to coherently present it. This assessment must be made in light of the particular capabilities and circumstances presented by each *pro se* litigant. *James*, 889 F.3d at 326–27. The Court of Appeals explains:

> The second step is itself grounded in a two-fold inquiry into both the difficulty of the plaintiff's claims and the plaintiff's competence to litigate those claims himself. The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand. Ultimately, the question is not whether a lawyer would present the case more effectively than the pro se plaintiff; if that were the test, district judges would be required to request counsel for every indigent litigant. Rather, the question is whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself. Notably, this inquiry extends beyond the trial stage of the proceedings. The relevant concern is whether the plaintiff appears competent to litigate his own claims, given their degree of difficulty. This includes all of the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial.

*Id.* (citations and quotations omitted). While courts need not address every concern raised in a motion for appointment of counsel, they must address "those that bear directly" on the individual's litigation capacity. *McCaa*, 893 F.3d at 1032.

The balancing contemplated in the second *Pruitt* step must also incorporate the reality that district courts cannot be expected to appoint counsel in circumstances which are common to all or many *pro se* litigants. *See Bracey v. Grondin*, 712 F.3d 1012, 1017–18 (7th Cir. 2013); *Pruitt*, 503 F.3d at 656 (observing that the Seventh Circuit has "resisted laying down categorical rules regarding recruitment of counsel in particular types of cases"); *Harper v. Bolton*, 57 F. Supp. 3d 889, 893 (N.D. Ill. 2014). Doing so would place untenable burdens on court resources. It would also turn the discretion of Section 1915(e)(2) on its head, making appointment of counsel the rule rather than the exception.

Against this backdrop, the Court finds that Plaintiff has not presented sufficient evidence or argument showing that he cannot litigate this matter competently on his own. It appears that he believed that counsel would be appointed to him, and explains that he is "slow to the workings of legal procedures." (Docket #63 at 2). However, Plaintiff's novice status and his belief that counsel would be recruited on his behalf does not entitle him to a lawyer as a matter of law, nor does it excuse him from complying with the Court's scheduling order. Moreover, Plaintiff's own motion to appoint counsel describes the case as "cut and dry," thereby indicating that the factual matter and the legal issues are not so complex as to be beyond the grasp of the average litigant. (Docket #32 at 1).

Moreover, the Seventh Circuit has rejected a plaintiff's sheer belief that a lawyer would do a better job as a reason for appointment of counsel. *Pruitt*, 503 F.3d at 655. Plaintiff's lack of legal training brings him in line with practically every other *pro se* litigant that comes before this Court. Furthermore, as a litigant in this Court, Plaintiff is under an obligation to familiarize himself with the relevant legal standards and procedural rules.

Implicit in Plaintiff's motion is the belief that he will not be taken seriously without a lawyer, and that he needs one to "go up against the city." (Docket #32 at 1). Yet that belief does not bear on Plaintiff's ability to perform his litigation tasks, including sending and receiving correspondence, making copies, reading and writing motions and briefs, and performing legal and factual research. *See McCaa*, 893 F.3d at 1032–33. Moreover, despite his claimed disadvantage in the legal process, Plaintiff has submitted no evidence that he suffers from cognitive, behavioral, or other limitations affecting his ability to present his arguments in a cogent fashion. *See Henderson v. Ghosh*, 755 F.3d 559, 565 (7th Cir. 2014); *Walker v. Price*, 900 F.3d 933, 940 (7th Cir. 2018) (noting that courts should consider "any available evidence" of a *pro se* litigant's literacy, communication skills, education level, litigation experience, intellectual capacity, or psychological history). His filings to date suggest that he has no such limitation. Thus, although discovery and summary judgment might be part of the "advanced phases" of a case, there is no reason to think Plaintiff is out of his depth. *James*, 889 F.3d at 327.

In light of the foregoing standards for appointment of counsel, the Court is constrained to deny Plaintiff's motion.

3. **MOTION TO COMPEL**

Plaintiff fashioned his second motion to compel as a motion for reconsideration of the initial motion to compel, (Docket #34), which was denied as premature, (Docket #27). The Court will treat the motion for reconsideration as a renewed motion to compel because Judge Adelman's initial denial of the motion to compel was not a final judgment or order subject to reconsideration under Federal Rules of Civil Procedure 59 or 60. Plaintiff also filed a third motion to compel, which reiterated the arguments

in his second motion to compel and suffered from the same shortcomings, discussed below. (Docket #61).

Parties are required to respond promptly and in good faith to discovery requests. Fed. R. Civ. P. 26(a), 33(b)(2), 34(b)(2). If a party fails to respond, the opposition may file a motion to compel. Fed. R. Civ. P. 37(a). Before doing so, however, Civil Local Rule 37 requires the requesting party to personally consult with the opposing party in order to attempt to resolve the issue. The rule requires a written certification that the moving party has attempted, in good faith, to confer. Civ. L.R. 37.

There is no evidence that Plaintiff timely submitted his discovery requests, or that he has attempted to consult with the opposing party to resolve the issue. This is a particularly unusual case because there is some evidence that the material sought to be compelled—the video—has already been produced. *See* (Docket #54-2). Whether it was received is not something over which the Court has power, but it was delivered to the address on file with the Court. In light of the foregoing, the Court has no basis on which to grant the motions to compel.

### 4.     MOTION FOR SUMMARY JUDGMENT

Defendants filed a motion for summary judgment on December 31, 2018. (Docket #36). Neither the motion, nor the accompanying proposed facts, were opposed. *See* (Docket #37). Accordingly, the Court will treat Defendants' statement of facts as undisputed for the purpose of their motion. Fed. R. Civ. P. 56(e)(2); Civ. L.R. 56(b)(4). For the reasons stated below, the motion for summary judgment will be granted, and the case will be dismissed.

### 4.1 Relevant Facts

Plaintiff was arrested on the morning of July 21, 2017. He was oppositional with the arresting officers and shackled at the ankles as a result. When he arrived at MCJ at around 10:50 a.m., the arresting officers required assistance to move Plaintiff from the police van into the jail. MCJ officers thought that Plaintiff was under the influence of "some sort of narcotics" because he seemed "incredibly agitated and aggressive and was sweating profusely." (Docket #37 ¶¶ 6–7).

After being cleared for booking, Plaintiff began to bang his head against the nursing station counter. The officers intervened and proceeded with booking. They escorted Plaintiff to a search room to perform a standard pat search. One of the officers asked Plaintiff to kneel on a bench, which he refused to do. Instead, he hopped up onto the bench. According to Defendants, this necessitated a "compliance hold[] to stabilize [Plaintiff] against the wall in a kneeling position" in order to effectuate the search. *Id.* ¶ 16.

Once the search was completed, at approximately 11:04 a.m., Plaintiff was escorted from the search room back into the main booking area, but continued to be "so combative" that it was necessary to clear the other inmates from the booking area to maintain order and security. Defendants explain that "[w]hile in the booking room, [Plaintiff] refused to stand to have his photograph taken" and "purposely went completely limp, using deadweight tactics, and refused to stand or move on his own." Plaintiff's passive resistance required the officers to hold him up in order to get his photograph taken and conduct fingerprints. Plaintiff used profanity against the jail staff throughout the booking process.

After booking was completed, the officers had difficulty transferring Plaintiff to a housing unit because he continued to go limp as a form of passive resistance. Plaintiff was assigned to Housing Unit 4D, which is reserved for the "most combative inmates." *Id.* ¶ 26. Officer Hunter ("Hunter") and Lieutenant Staat ("Staat") attempted to escort Plaintiff to Housing Unit 4D, but found it difficult in light of Plaintiff's posture and body weight. They elected to put Plaintiff in a wheelchair to transport him to Housing Unit 4D, whereupon they tried to change him into jail clothes. Plaintiff refused to change out of his street clothing, and continued to remain limp and uncompliant. Hunter and Staat had to physically change Plaintiff into his jail clothes. At some point during this cumbersome clothes-changing process, while attempting to put Plaintiff in another wall stabilization hold, Hunter and Staat noticed that Plaintiff had a laceration above his left eyebrow. They were unsure of how this laceration occurred. One possibility is that "the officers wobbled a bit as they tried to hold [Plaintiff] upright and this inadvertently caused a cut above Plaintiff's eyebrow." (Docket #44 at 19). Upon seeing the cut, they promptly contacted the nursing staff.

Nurse Trisha Majewski arrived in the recreation area of Housing Unit 4D at 11:33 a.m. and determined that Plaintiff needed stitches. At 11:47 a.m. he was escorted to the health clinic. Plaintiff became agitated, and Hunter and Officer Dingman had to "physically restrain [Plaintiff] as nursing staff attempted to stitch his cut." (Docket #37 ¶ 46). Though he only needed five stitches, the process took nearly an hour.[2]

---

[2] Defendants submitted a DVD with their motion for summary judgment materials. *See* (Docket #38 ¶ 2). This DVD was not readable, and the Court did not consider it in evidence. The DVD only contains footage of the booking room, *id.*,

Plaintiff was released from MCJ the next day.

MCJ staff rely on a standard called Principles of Subject Control ("POSC") to evaluate when to use force in correctional settings. POSC permits officers to use a variety of force techniques upon noticing various "indicators" that purportedly "could allow [officers] to predict that a subject is going to become assaultive." *Id.* ¶ 54. POSC evaluations consider five factors, the first of which is "level of resistance," which can be used to assess the "degree of threat," and encompasses everything from virtual unconsciousness to assault with a deadly weapon. *Id.* ¶¶ 55–56. This broad spectrum includes deadweight tactics. Officers are also trained that when an inmate ignores officers and ceases all movement, this "may predict a possible assault." *Id.* ¶ 57. Based on the level of resistance, POSC prescribes a range of intervention and stabilizing techniques, though officers are under no obligation to start with the lowest one. POSC instructs that officers can use "control alternatives" (i.e., force) to "overcome passive resistance," including the use of a baton. *Id.* ¶ 64; (Docket #38-3 at 65–66). In other words, POSC's guidelines are so permissive that officers are allowed to use batons against a passively resisting inmates. Defendants do not make use of the other factors that might be considered in the POSC use of force assessment.

---

making it less relevant because the wall holds in question occurred in the search room and in Housing Unit 4D. In a somewhat contradictory turn, in his motion to compel the video surveillance footage, Plaintiff acknowledged that there were no video cameras in the areas where he alleges that he was harmed. *See* (Docket #15 at 2) ("[O]fficers made sure to wheelchair [Plaintiff] to a place where there were no cameras. . .present to do the dirty dee[d] in the first place."). Moreover, Plaintiff did not oppose Defendants' proposed facts or motion for summary judgment. Therefore, the DVD evidence is ultimately of little concern.

On two occasions, first during the pat search, and second during the clothes changing in Housing Unit 4D, Staat and Hunter used a wall stabilization technique to handle Plaintiff, which is one of the compliance holds permitted by the POSC training guide to "overcome passive resistance." (Docket #37 ¶ 65). This entails officers using their shoulders and legs to keep an inmate upright against the wall. *Id.* ¶ 66. Officers are instructed to face inmates away from them to minimize resistance. *Id.* ¶ 67. The officers speculate that Plaintiff's injury may have occurred during one of these holds.

### 4.2    Legal Standard

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

### 4.3    Analysis

#### 4.3.1    Fourteenth Amendment Violation

The Fourteenth Amendment governs a pretrial detainee's use of force claim. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473. "[O]bjective

reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts must consider what the officer knew at the time that the force was used. *Id.* Courts "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to the 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)). The following factors bear on reasonableness of force: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

Defendants assert that their use of force—the wall hold—was necessary and reasonable under the circumstances of Plaintiff's passive resistance and established non-compliance. The wall hold was intended to manage Plaintiff in order to complete the booking process. Although it was forceful, it was not designed to injure or otherwise cause harm, unlike other force techniques at their disposal. Defendants believe that Plaintiff's injury occurred during the second wall hold, during which they attempted to dress Plaintiff in jail clothes, and had some difficulty maneuvering him. Thus, although their use of force was purposeful and knowing, it was also proportional to the needs of the correctional facility to process pretrial detainees. Defendants affirm that any injury that occurred was an accident derived from Plaintiff's non-compliance, and "liability for negligently

inflicted harm is categorically beneath the threshold of constitutional due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1990).

Plaintiff has not provided any evidence to the contrary. There are no affidavits from eye-witnesses who saw the officers beat him up. There are no photos of the laceration for a jury to evaluate whether the injury was so severe as to suggest intentionality. In short, there is nothing in the record to dispute the relevant facts proffered by the defendants.

The Court has reviewed the evidence and, even when considered in the light most favorable to the non-moving party, it does not suggest that the wall hold was an unconstitutional use of force. There is also no evidence from which a jury could conclude that the laceration was the result of an excessive and intentional use of force. Accordingly, there is no evidence upon which a reasonable jury could find that Plaintiff's Fourteenth Amendment rights were violated.

### 4.3.2 Monell Claim

A municipal entity can be liable under Section 1983 only when there is a predicate constitutional violation, and that violation is a result of that entity's (1) express policy; (2) widespread custom or practice; or (3) a decision by an agent of the entity who has "final policymaking authority." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Plaintiff has not made any arguments that the POSC on which Defendants rely are unconstitutional, so there is no express policy at issue, nor is there a decision by a final policymaking authority. Rather, Plaintiff asserts a widespread custom or practice of abuse.

In order to establish liability on the part of Milwaukee County for a widespread pattern and practice of abuse, Plaintiff must provide evidence

inflicted harm is categorically beneath the threshold of constitutional due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1990).

Plaintiff has not provided any evidence to the contrary. There are no affidavits from eye-witnesses who saw the officers beat him up. There are no photos of the laceration for a jury to evaluate whether the injury was so severe as to suggest intentionality. In short, there is nothing in the record to dispute the relevant facts proffered by the defendants.

The Court has reviewed the evidence and, even when considered in the light most favorable to the non-moving party, it does not suggest that the wall hold was an unconstitutional use of force. There is also no evidence from which a jury could conclude that the laceration was the result of an excessive and intentional use of force. Accordingly, there is no evidence upon which a reasonable jury could find that Plaintiff's Fourteenth Amendment rights were violated.

### 4.3.2 Monell Claim

A municipal entity can be liable under Section 1983 only when there is a predicate constitutional violation, and that violation is a result of that entity's (1) express policy; (2) widespread custom or practice; or (3) a decision by an agent of the entity who has "final policymaking authority." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Plaintiff has not made any arguments that the POSC on which Defendants rely are unconstitutional, so there is no express policy at issue, nor is there a decision by a final policymaking authority. Rather, Plaintiff asserts a widespread custom or practice of abuse.

In order to establish liability on the part of Milwaukee County for a widespread pattern and practice of abuse, Plaintiff must provide evidence

that would lead to a reasonable inference that Milwaukee County was deliberately indifferent to the widespread practice. *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003); *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 407 (1997). Deliberate indifference is typically proven in *Monell* cases by "a pattern of similar constitutional violations." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Such a *de facto* policy of constitutional violations occurs if the defendants had a habit of purposefully ignoring a need for action. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Thus, Plaintiff must provide evidence that Defendants had notice of an ongoing problem such that allowing the problem to endure was akin to a conscious choice among alternatives. *Canton*, 489 U.S. at 389, *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985). This can be done by "showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995).

Plaintiff has not proffered any evidence showing that there was a widespread *de facto* policy of abusing inmates on the way to Housing Unit 4D. Not only is there no evidence that Plaintiff was beaten up, there is no evidence that other inmates were beaten up, either. There are no affidavits from other passive resistors who were injured. There is simply no evidence upon which a reasonable jury could draw to find Milwaukee County liable for a pattern and practice of abuse in Housing Unit 4D.

## 5. CONCLUSION

In light of the foregoing, the Court is constrained to deny Plaintiff's motion for appointment of counsel, deny Plaintiff's motion to compel, and grant Defendants' motion for summary judgment.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion to appoint counsel (Docket #32) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for reconsideration of the motion to compel (Docket #34) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for extension of time (Docket #35) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Docket #36) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to add parties (Docket #58) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to compel (Docket #61) be and the same is hereby **DENIED;** and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 13th day of August, 2019.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge